1  Gregory Nicholas Steshenko, Plaintiff *Pro Se*
   3030 Marlo Court
2  Aptos, CA 95003
   tel. (831)688-1210
3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                         SAN FRANCISCO DIVISION

11

12 | **GREGORY N. STESHENKO,** | **Case No. 09-cv-05543 RS**

13 |         **Plaintiff,**      | **PLAINTIFF'S *DAUBERT* MOTION TO PRECLUDE OPINION TESTIMONY OF MARK COHEN**

14 |         v.

15 | **THOMAS MCKAY, DOROTHY NUNN,**
   | **and ANNE LUCERO of the Cabrillo**    | **FRE 702 and 703**
16 | **Community College District; CABRILLO**
   | **COMMUNITY COLLEGE DISTRICT;**        | Date:       November 6, 2014 Thursday
17 | **KRISTINE SCOPAZZI, BERTHALUPE**      | Time:       1:30 PM
   | **CARRILLO, and SALLY NEWELL of**      | Judge:      Honorable Richard Seeborg
18 | **Watsonville Community Hospital;**    | Courtroom:  3 – 17th Floor
   | **WATSONVILLE COMMUNITY**
19 | **HOSPITAL,**

20 |         **Defendants.**

21

22

23

24

25

26

27

28

                                                        *Daubert* Motion
                                                        Case No. 09-cv-05543

### I. <u>NOTICE OF MOTION</u>

On November 6, 2014, Plaintiffs will move for an Order, pursuant to Federal Rules of Evidence 702 and 703, precluding testimony of Defendants' expert witness Mark Cohen from trial.

### II. <u>RELIEF SOUGHT</u>

Plaintiff seeks the Court's entry of an Order precluding trial testimony of Defendants' expert witness Mark Cohen on the matters outside his area of expertise.

### III. <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

**A. Legal Standards**

Generally, evidence is admissible if it is relevant and reliable. FRE Rules 702 and 703 govern the admission of scientific evidence in federal courts. The *Daubert* court required that trial judges act as gatekeepers and determine the scientific validity of scientific evidence before admitting it. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (U.S. 1993). The guidelines in the decision were expanded to include technical and specialized knowledge testimony as well.

The testimony of an expert witness has to pass two tests for a judge to accept:

1) Reliability:

- Empirical testing: the theory or technique must be falsifiable, refutable, and testable.
- Subjected to peer review and publication.
- Known or potential error rate.
- Whether there are standards controlling the technique's operations.
- Expert's qualifications.
- Technique and its results are described with plain meaning.

2) Relevancy.

According to FRE Rule 702, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."

After the decision in *Daubert*, Rule 702 was amended to include the additional provisions which state that a witness may only testify if:

> "**(b)**  The testimony is based upon sufficient facts or data;
>
> **(c)** The testimony is the product of reliable principles and methods; and
>
> **(d)** The witness has applied the principles and methods reliably to the facts of the case."

A proper expert witness must provide the court with the objective, unbiased scientific/technical information. Any subject can be addressed by opinion testimony. so long as it is outside the ordinary knowledge of lay jurors and judges. But an expert cannot be allowed to invade the province of the fact finder by substituting his judgment of the evidence in an area that is not beyond the grasp of a lay person. See *ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 198 F. Supp. 2d 598 (E.D. Pa. 2002) (rejecting expert's explanation of economic rationale—namely, the profit motive—as not beyond the grasp of the ordinary juror).  Nor may an expert merely ac as an advocate, by, for example, setting out conclusory arguments of a party or offering a speculative opinion as to the motives of a party. See *Highland Capital Mgmt., LP v. Schneider*, 379 F. Supp. 2d 461 (S.D.N.Y. 2005) (rejecting attorney expert's opinion regarding state of mind and motivation of parties). An expert may not offer opinions on the law, which would invade the province of the judge. See DiBella v. Hopkins, 403 F.3d 102 (2d Cir. 2005) (excluding legal conclusion that plaintiff's actions constituted extortion).

   An expert's opinion must have supporting facts or data that reasonably comport with the evidence in the case. FRE 703 requires that this background information be "of a type reasonably

relied upon by experts in the particular field." This foundational data must be accurate and accurately reflect the undisputed circumstances of the case. See *Slaughter v. S. Talc Co.*, 919 F.2d 304, 307 (5th Cir. 1990) (expert based opinions on examination reports that were replete with errors and that contradicted plaintiffs' own statements); *Chan ex rel. Estate of Brewer v. Coggins*, No. 3:05-CV-254 HTW-LRA, 2007 WL 2783355, at *2–4 (S.D. Miss. 2007) (accident reconstruction ignored turning radius of truck and testimony of eyewitnesses).

Experts may reach differing conclusions based on competing fact scenarios. If an expert relies upon factual assumptions that are unfounded, then the factual predicate is insufficient, and the opinion should be excluded. See, e.g., Elcock v. Kmart Corp., 233 F.3d (3d Cir. 2000), at 754–56, nn.12–13 (discussing cases excluding opinions not grounded in the facts of the case).

It is not sufficient for an expert to simply cite reliable principles and methods, and then reach a conclusion without demonstrating how he reasoned from his methodology to his result. Even if the expert's technique is valid, his opinion is not reliable if he misuses the methodology. See Catherine E. Brixen and Christine M. Meis, Note, *Codifying the "Daubert Trilogy": The Amendment to Federal Rule of Evidence* 702, 40 JURIMETRICS J. 527, 533 (2000). "Conclusions and methodology are not entirely distinct from one another." Gen. Elec. Co. v. Joiner, 522 U.S. 146 (1997). If there is an analytical gap between the expert's data and his opinion, then the court needs not admit the testimony.

### A. The Exhibits

Defendants' expert witness disclosure is presented in Exhibit A. It contains all Defendants' expert reports. Exhibit B contains Plaintiff's subpoena of all the documents used by Mr. Cohen in preparation of his expert report. Aside from the case evidence, all the additional documents that

Mr. Cohen reviewed for preparation of his report and produced as such are given in Exhibits C through J.

As Defendants produced the expert report in their usual scanned manner much criticized by the Court, Plaintiff converted it into a text file using the optical character recognition software, and annotated it. The annotated version is presented in Exhibit K. It contains the original expert report of Mr. Cohen produced in 2012, and his supplemental expert report produced in 2014. Plaintiff's annotations are emphasized with the dark blue italics font.

### A. Background of Mr. Cohen

As per Mr. Cohen's resume in Exhibit A, he received a B.S. in Business Administration with emphasis on finances, an M.S. in Management with emphasis on international finances, and M.A. in Counseling. His educational background is in "business administration", with concentration on finances, as well as some poorly defined subject called "counseling." Though he calls himself "Chief Economics", he has no proper educational background in the science of economics. His entire career is spent in the litigation services: valuation of economic losses claimed in the lawsuits. Beyond that, he has no experience.

In other words, Mr. Cohen is a professional expert accountant narrowly specializing in damage valuation for litigation purposes. Mr. Cohen is not a Certified Public Accountant ("CPA"), hence even his accounting expertise is highly questionable

Mr. Cohen has no expertise in macroeconomics, including trends in the American economy, and no expertise in engineering, nursing, medicine, biomedical research and natural sciences. He has never worked in human resources of any corporation. He has no expertise in the hiring process and hiring trends in the foregoing scientific fields.

Mr. Cohen's limited expertise vis-à-vis this case only allows him to prepare a competent valuation of Plaintiff's losses according to the generally accepted accounting principles, taking as an input a variety of feasible initial conditions for his accounting models. To be objective, he has to present the valuation models based on Defendants' side of the story, and those based on Plaintiff's side of the story. Mr. Cohen prepared no such valuations. Instead, he opted to express his legal opinions and his other opinions on the subjects outside of the area of his expertise, such as engineering or nursing employment, economic health of this country, Plaintiff's lack of efforts in mitigation of his damages, relationship of nursing and biomedical sciences, etc. Hence, his intended testimony fails the requirements of Rules 702 and 702, as well as principles of *Daubert*.

**B. The documents that Mr. Cohen reviewed and disclosed.**

The original and the amended expert reports of Mr. Cohen presented in Exhibit A contain no reviewed documents, only his resume, rate schedule and a list of testimonies. Therefore, on August 27, 2014, Plaintiff subpoenaed the documents he used to form his opinions, as per Exhibit B. Mr. Cohen responded with a number of documents that formed evidentiary background of his testimony. The documents are:

(1) California Board of Registered Nursing ("BRN") 2010-2011 Annual School Report presented in Exhibit C.

(2) 2010 Report Brief titled "The Future of Nursing – Focus on Education" presented in Exhibit D and issued by an "independent nonprofit" non-governmental organization ("NGO") called Institute of Medicine of the National Academies.

(3) BRN table on NCLEX[1] pass rates presented in Exhibit E.

---

[1] Examination for nursing licensing

(4) A table with summary of purported advertisements on the various Internet job boards for engineering and scientific positions in the Bay Area, prepared by a private company Wanted Analytics, a purported "business intelligence" center. A letter from Wanted Analytics regarding that table, together with the first 2 pages of the table and the table summary prepared by Mr. Cohen are presented in Exhibit F.

(5) The purported Occupational Employment Statistics ("OES") from the US Bureau of Labor Statistics ("BLS") presented in Exhibit G. The authenticity and reliability of that document is questionable, as Plaintiff was not able to find it on the BLS web site, and the document purports to the presence of jobs in Santa Cruz – Watsonville area that simply do not exist because nowadays the area has no companies engaged in computer hardware or electronics development.

(6) A purported survey of unemployment of unspecified origin presented in Exhibit H.

(7) A multi-year survey of the median length of the job search by people of unknown occupations under the unknown conditions in an unknown geographical location, purportedly prepared by Challenger Gray and Christmas, an executive outplacement firm. It might be an advertising material of that firm specifying how quickly its clients are getting re-employed. The survey is presented in Exhibit I.

(8) A page from a private entity called American Nurses Credentialing Center describing its Magnet Recognition Program. The page is presented in Exhibit J.

**C. Application of Principles and Methods by Mr. Cohen to the Foregoing Data**

(1) Mr. Cohen extracted from Exhibit C the following information:

(a) The attrition rate of 18.1% for ADN programs in 2010-2011. See Exhibit C, page 8. Based on that data, Mr. Cohen concludes that Plaintiff would likely fail or drop

out of the program. See Exhibit K at ¶6. However, the 2010-2011 attrition rate is irrelevant, as Plaintiff would graduate in 2010. The attrition rate for 2009-2010 was 16.8%. Given Plaintiff's Master's and Bachelor's degrees obtained after completion of rigorous programs in engineering and science, an application to him of an average attrition rate of Associate degree programs is not proper.

(b) The first-time NCLEX passage rate for ADN program graduates in 2009-2010 is 88.6%. See Exhibit C, page 9. Mr. Cohen in bad faith claims ignorance of that fact and alludes to a conclusion that Plaintiff would not likely pass the exam. See Exhibit K at ¶7. Also, Mr. Cohen in bad faith omits data from the reviewed and produced by him BRN document in Exhibit E, according to which in 2009-2010 the first-time NCLEX passage rate for Cabrillo ADN graduates was 85.95%.

(c) In 2010-2011, 54.4% of the new nursing graduates found hospital employment, and only 68% of that employment was in California. See Exhibit C, page 10. Based on it, Mr. Cohen opines that Plaintiff would likely not find employment in a hospital. See Exhibit K at ¶¶ 16-17. First, Mr. Cohen incorrectly interprets data. If Plaintiff has more than 50% probability of finding hospital employment, he is **more likely** to find such employment than not. Second, Mr. Cohen operates with wrong data. The period of 2010-2011 is irrelevant, as Plaintiff was to graduate in the first half of 2010. In 2009-2010, 59.0% of the recent graduates found hospital employment, 81.1% of them in California. See Exhibit C, page 10.

(2) Based on data in Exhibit F, Mr. Cohen concluded that the employment situation for engineers is healthy. According to Mr. Cohen, data in Exhibit F provide "job posting information from employment websites like monster.com, Dice, Yahoo! Hot Jobs and others." Mr. Cohen claims that "between October 1, 2009 and

7 *Daubert* Motion
Case No. 09-cv-05543

December 31, 2010 there were over 15,000 job postings in the relevant geographical region for electrical/electronic engineer, computer hardware engineer, research scientist and medical and clinical laboratory technician positions were documented (*sic*)." See Exhibit K at ¶ 46. In other words, for Mr. Cohen, ads on Internet boards constitute reliable evidence of healthy employment situation. By the same token, Mr. Cohen is able to conclude that Plaintiff has failed his mitigation obligations by refusing to become a millionaire. On a daily basis, Plaintiff's email spam folder is becoming filled with messages from "Nigerian princes" and "widows" of Saddam Hussein, who promise to send him a check for hundreds of millions of dollars in exchange for a small processing fee. According to the logic of Mr. Cohen, the large number of these emails surely attests to their veracity and to the fact that Plaintiff could become overnight a multi-millionaire.

Mr. Cohen also failed to connect the purportedly advertised jobs to Plaintiff's qualifications. Each of the alleged openings has certain requirements as to the skills of the applicants and the recency of these skills. Mr. Cohen knows neither Plaintiff's job history nor his skill set. A claim that an abstract engineer would be hired for some abstract position is absurd.

Mr. Cohen's statement about the health of engineering employment is a clear non sequitur. A large number of Internet advertisings does not mean that the real openings exist and that the job market is healthy. People place Internet ads for many reasons, including statutory advertisement of a job for which an H-1B visa holder is already hired, and desire to find out what their competitors are working on. Mr. Cohen fails to adhere to the basic scientific methodology

that, foremost, would establish correlation between the internet board advertising and the actual hiring (the number of advertisements v. the number of hired engineers varied by time periods), and then would try to verify the theory of the "healthy" job market empirically, by attempting to find employment in it for Plaintiff.

(3) Based on data in Exhibit G, Mr. Cohen concludes that the wages of engineers are much higher than those of nurses nowadays. See Exhibit K at ¶ 22. First, as stated above, data in Exhibit G are unreliable, as the engineering occupations specified in it are simply absent from Santa Cruz – Watsonville geographical area. Second, Mr. Cohen presents no data on nursing wages in that area, hence he has no foundation for his comparison.

(4) Based on **median** data in Exhibit I, Mr. Cohen concludes that Plaintiff could readily find employment. See Exhibit K at ¶ 26. First, as discussed above, Exhibit I is highly unreliable. Second, Mr. Cohen either acting in bad faith, or is ignorant of the basic statistical notions. The **median** has no statistical distribution significance. For example, if we try to characterize earnings of the non-dispossessed American population by the median net worth, that is by taking the net worth of Mr. Cohen (assuming that it is the lowest amongst the middle class), adding it to the net worth of Bill Gates or Warren Buffet, and dividing it by 2, we would establish that all Americans are billionaires, that is obviously not true. The table in Exhibit I, reviewed and produced by Mr. Cohen, shows that the median data undergo no significant changes in boom years (i.g.1995) and bust years (i.g., 2008). The table in Exhibit H, reviewed and produced by Mr. Cohen but not mentioned in his report, demonstrates that in 2009, out of 2,593of the unemployed managers and professionals, 1,556 were

unemployed 15 weeks or longer, and 1,064 were unemployed longer than 27 weeks. The mean duration of unemployment was 30 weeks. The data of statistical significance are the **mean** and the **standard deviation**. To be relevant and to convey some degree of reliability, even those data must represent the proper population, i.e. the long-term unemployed in the instant case.

(5) Based on Exhibits D and J, Mr. Cohen concludes that Plaintiff would not be employable as a nurse with an ADN degree because "Institute of Medicine, American Nurses Credentialing Center and others are seeking to make sure 80% of registered nurses in hospitals have bachelor's degrees or higher by 2020." See Exhibit K at ¶14. Yet, first, Exhibit D contains no such information. Only Exhibit J references some recommendation of that nature. Second, Institute of Medicine and American Nurses Credentialing Center are private corporations that are not the authorities in that field. Their unaccepted by the industry ideas projected to 2020 are irrelevant. Third, Mr. Cohen also fails to mention that Plaintiff possesses the highly relevant Bachelor's degree in Biochemistry and Molecular Biology, the foundational sciences for all biomedical and health care disciplines. The future of all health care occupations depends on the research and discoveries in these sciences.

Many data on which Mr. Cohen based his opinions are unreliable. The foregoing discussion shows that Mr. Cohen did not properly quantitatively process or qualitatively interpret a single datum, reliable or unreliable, that he reviewed.

**D. The "Expert" Report of Mr. Cohen and his Intended "Expert" Testimony**

Mr. Cohen did not do the only job for which he is qualified as an expert: to prepare accounting valuation of Plaintiff's pecuniary damages using a variety of scenarios according to Defendants' and Plaintiff's allegations. Instead, Mr. Cohen chose to act as a legal advocate for Defendants.

(1) Mr. Cohen expressed a number of legal opinions on the merits of the case, and purported to his ability to act as the fact finder. See Exhibit K at ¶¶ 6, 7, 8, 18, 19, 20, 21, 22, 23, 40, 43, 44, and 45.

(2) Mr. Cohen opined on a number of subjects outside of his area of expertise. See Exhibit K at ¶¶ 5, 6, 7, 8, 17, 19, 20, 21, 22, 23, 29, 42, 43, 44, 45, and 51.

(3) Mr. Cohen made a number of false factual statements. See Exhibit K at ¶¶ 23, 24, 43 and 49.

(4) Mr. Cohen's opinions lack evidentiary foundation and are based on clearly false premises. See Exhibit K at ¶¶ 5, 7, 8, 10, 12, 13, 18, 19, 20, 21, 22, 23, 26, 28, 29, 36, 37, 38, 39, 43, 44, 45, 46, 48 and 51

(5) Mr. Cohen's opinions are *non sequitur*. See Exhibit K at ¶¶ 9, 11, 14, 25, 28, 46 and 48.

(6) Mr. Cohen's opinions are absurd. See Exhibit K at ¶¶ 9, 11, 36 and 38.

(7)  Mr. Cohen bases his opinions on the purported factual statements and opinions of certain Katherine Kelly, who is not disclosed as Defendants' expert and will not testify at trial. See Exhibit K at ¶¶ 15 and 17.

(8) Mr. Cohen's opinions constitute logical fallacies. See Exhibit K at ¶¶ 5, 7, 8 and 18.

(9) Mr. Cohen demonstrated ignorance in the subjects on which he opined. See Exhibit K at ¶¶ 10, 13, 14, 15, 23, 42, 43, 44 and 49.

(10) Mr. Cohen based his opinions on irrelevant information.  See Exhibit K at ¶¶ 6, 14 and 16.

(11) Without being disclosed as a rebuttal witness, Mr. Cohen attempts to rebut some old unofficial estimates of Plaintiff's pecuniary damages that were prepared for the failed settlement conference. These estimates will not be entered into evidence. That part of Mr. Cohen's report is entirely useless, and he cannot testify on these subjects. See Exhibit K at ¶¶ 31, 35, 36, 37, 38, 39, 40 and 41.

The "expert" report of Mr. Cohen contains no matters within his area of expertise, that is accounting and financial affairs. He did not prepare any models for valuation of Plaintiff's pecuniary damages and did not present any assessment of such damages. However, he expressed numerous conclusory statements outside of his area of expertise as to the facts of the case, as well as his lay fact finding, and his legal opinions. He discloses no scientific methodology and principles, and in fact applies none of it to the data. His method of data collection is to assemble the irrelevant data from dubious sources that, in his opinion, are unfavorable to Plaintiff's case and to omit the data that are favorable. Then, Mr. Cohen misinterprets the collected data, sometimes clearly in bad faith, a sometimes because he woefully lacks background in basic statistics. Mr. Cohen apparently expects that the lay jury would not be able to discern Mr. Cohen's lack of scientific methodology and ignorance in the field in which he purports to have expertise. Mr. Cohen does not understand that meaning of words that he is using and oftentimes renders absurd opinions. Mr. Cohen's "expert" report contains no expertise, and is concocted to help Defendants to get away with entry of unqualified conclusory statements and lay legal opinion into evidence. All of Mr. Cohen's opinions are irrelevant to this case. None of his opinions is reliable. His entire "expert" testimony should be excluded from trial. That preclusion would benefit Mr. Cohen, as it would preserve his reputation, if he has any. At trial, Plaintiff would be able to show easily on cross-

examination that Mr. Cohen possesses no claimed expertise and is ignorant in the basic scientific notions. Mr. Cohen's "expert" testimony would simply waste the Court's time.

Wherefore, Plaintiff asks the Court to exclude Mr. Cohen's "expert" testimony in its entirety.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court precludes Mr. Cohen "expert" testimony from trial.

Dated: October 3, 2014                     Respectfully submitted,

_____
Gregory Steshenko, Plaintiff *pro se*